Thank you. Please be seated. Good morning everyone. We have four cases on the calendar for today, three of which are being argued. I understand that all counsel are present, so we'll begin with case number 21-1250, Gwye v. People's United Bank. Mr. Tariq, whenever you're ready. Good morning, your honors. May it please the court. My name is Subhan Dariq. I'm here on behalf of Ms. Sakna Gaye. I wanted to raise a few points, particularly the closure of the overdrawn Mokmin account and the personal accounts are directly linked and are not attenuated as the bank seems to allege. The bank sent a letter on July 13, 2016, stating specifically that it had the right to close the additional account relationships with Ms. Gaye if the overdrawn account was not corrected. Very conspicuously, the bank never addresses this letter. The bank completely ignores it in their motion for summary judgment, in the opposition to this brief. The bank concedes that they were in error on the closing of the account, don't they? Could you repeat that? Sorry. So they admitted they did that wrongly. They admit that they closed the nonprofit account wrongly. That's correct, your honor. However, the personal accounts, they allege that they were closed because of a risk tolerance that the Ms. Gaye did not rise to their risk tolerance, which is not consistent with the evidence. It's also not consistent with what their position in the State Division of Human Rights proceedings were. At that time, they stated and throughout the litigation, they stated that the closure of the personal accounts was a result of the overdraft. However, they've changed their story now to say that the closure of the accounts was a result of the risk tolerance. I have brought a copy of the letter that the bank had sent, and it states very specifically, We will allow the accounts ending in 4406, 1403, and 0172 to remain open for 60 days from the date of this letter to allow you to rectify your account. And consistent with the letter that they sent on July 13th, the bank ultimately closed Ms. Gaye's personal and custodial accounts due to the overdraft. And they testified Ms. Wilbur, the bank's senior vice president, testified that when asked why an overdraft in the charity account would cause the bank to close Ms. Gaye's other accounts, Ms. Wilbur testified because although they were different entities, she was still the owner on all the accounts. And the bank has knowledge that those were her accounts and wouldn't want to do business with someone that owed them money. And so now the bank says that we closed her personal accounts as a result of a risk tolerance, when in actuality that's not consistent with the record. So you're talking about these varying answers being a cover for pretext. That is correct, Your Honor. And the law is that suspicious timing with other pretexts can be sufficient to survive summary judgment. And that's the situation here. Before you get to pretext, what's the strongest evidence you have that there is discriminatory motive here? When plaintiff went to the bank after the closures, Ms. Gaye was stranded overseas for four months as a result of the closure of her personal accounts. When she finally returned, she went to the bank and requested the bank reopen her accounts. Ms. Andrews, Shamika Andrews, who was the bank teller at the time, told her she was not able to open her accounts because of the countries she traveled to. And that lays foundation for the discriminatory intent that they racially profiled her into believing that she's a member of some suspect class. I guess I don't follow the link between certain countries falling within the bank's risk tolerance and racially profiling her individually.  Can you explain the connection between certain countries being on the bank's risk tolerance? I don't know. And not surprisingly, I might add, if you would look at the list of the countries. Sure, there are certain countries that the banks list for money purposes. And then the allegation I think that you're making now as to her individually being profiled for her account being closed. Ms. Gay had been a customer with the bank for five years prior to the closures of the accounts. Her entire transaction history was consistent during that time. She had traveled overseas at times that her accounts were placed on hold because she did not notify them. She did notify them prior to this travel. And the only thing that changed in this circumstance was that now she ran a non-profit, a Muslim non-profit account. And the bank admitted their error. The bank admitted that we closed your non-profit account as a result of the overdraft. However, even though they acknowledged their mistake, they were unwilling to reopen her accounts. They testified during depositions that Ms. Andrews testified that she could not recognize a Muslim who was wearing a hijab. She does not know what a Muslim was. She did not know who Malcolm X was, even though she herself was an African American who worked in a very predominantly immigrant community in Queens. And so the inferences are to be drawn by a jury that would judge the witnesses' credibility with regards to why the accounts were closed or not reopened. Further, the changing story is a sign of pretext. During the New York Division of Human Rights, which I would note that Ms. Winholz was representing the bank during those proceedings, they never raised risk tolerance at all. They only said that the reason for the closures was a result of the overdraft in the non-profit accounts. At that point, did they admit the mistake in closing the personal account? At that time, they had admitted their mistake in closing the personal accounts. And yet they still used that as the reason for closing the other accounts. That is correct, Your Honor. Thank you. Thank you, Counsel. We'll hear from Ms. Winholz. You may take off your mask, Your Honor. Thank you. Thank you. And I apologize for the coughing. Maybe you should put it back on. I don't have COVID. I was tested. Thank you. Good morning, Your Honors. May it please the Court, my name is Diane Winholz. I'm here as counsel for appellee defending People's United Bank. Appellant in this case alleges that her accounts with People's United Bank were closed and not reopened because of her race, national origin, and religion. The district court correctly found that appellant failed even to make out a prima facie case with regard to her claims of discrimination. And furthermore, failed to rebut the bank's legitimate non-discriminatory reasons for its actions. First, the undisputed facts in this case do not support that the closing of the accounts or the bank's decision not to reopen the accounts occurred under circumstances which give rise to an inference of discrimination. Did the bank allow her to reopen her accounts? I apologize, Your Honor. What's the reason the bank had for not allowing her to reopen her accounts? Your Honor, the reason that the bank did not allow Ms. Goyer to reopen the accounts is simply because the transactions had raised an alert which could not be cleared by the SAR analyst at PUB. And as a result of that, the bank made the decision that Ms. Goyer's transactions exceeded its risk tolerance and would not allow her to continue to bank at PUB. So this was a law that you were required to comply with? Correct, Your Honor. It's under the Bank Secrecy Act and anti-money laundering statutes. As our amicus BPI, the Bank Policy Institute, explained in its amicus brief, there are very stringent requirements that banks need to operate under to ensure that there is no money laundering or money that is going to terrorist activity. So what was the relationship between closing the charity accounts and the personal account since you admit then and probably now that closing the personal account was an error of the banks? So there really was no relationship, Your Honor. But it seems- It seems to be that way because of the timing. Correct, Your Honor, correct. So the relationship is as such. The Moomin account was opened a day before Ms. Goyer left the country. The following day, Ms. Goyer left the country. The bank has no record of her advising the bank that she was leaving the country, not that she was required to, but they have no record and Ms. Goyer produced no evidence that she advised the bank that she was leaving the country. Ms. Goyer opened the Moomin account with $50 and there were no transactions on the Moomin account. There was $50 in the account when it was opened and each- because it was opened incorrectly as a product that incurred service charges, each month the account incurred a $16 charge, which not surprisingly then in three months, it was in an overdraft situation. And so on May 17th, the $50 was depleted. It was in an overdraft. And the bank automatically generates a letter to customers when they're in an overdraft situation. There's no indication of the person's race, religion, or national origin. The letters were sent to the Moomin Foundation at the address provided by Ms. Goyer. Ms. Goyer testified that there was somebody there who was receiving the mail while she was out of the country, but claims she never got the letters. When the overdraft was not corrected within the 60-day period, the Moomin account was closed. Again, no money coming in, no money going out other than the service charge. No indication of any traffic. What made you look at the other accounts? So then on July 13th, 2016, a letter was sent to Ms. Goyer. Again, automatically generated letter that the bank's policy since Ms. Goyer did have other accounts at PUB, she was advised that the bank has the right to close those other accounts because- So it was tied directly to the overdraft that you looked at the other accounts? The connection is that Ms. Goyer is listed as an owner on the other accounts. So you looked at other accounts after this one was closed because of the bank's error? So it had not yet been closed, but they advised Ms. Goyer that they had the right to close the accounts because she was in an overdraft on another account that she had with the bank. But your point is that I gather that all of this train of events, however good, bad, or indifferent it was with respect to what the bank did, there's no reflection of racial or any other kind of madness. It was all essentially automatic. That's exactly right, Your Honor. There's no link to Ms. Goyer's national origin, race, or religion. She essentially claims, and if I could just add one other thing, the bank had already started looking into the transactions that were the subject of these alerts before the movement account was even closed. There is a document, an email, on May 20th, 2016, which is before Ms. Goyer was even sent the first letter in this case about the overdraft. Before the overdraft? The first letter was sent on May, I apologize, Your Honor. The first letter was sent on May 26th. And when did the overdraft force the movement account to be closed? The movement account was closed on July 15th. Of the same year? 2016. The personal and custodial accounts were closed on September 16th, 2016. But during the months of approximately April through July, the bank was investigating the transactions that Ms. Goyer was making in the personal accounts. And why were they investigating them? Because there's a monitoring system that banks are required to maintain to ensure compliance with the Bank Secrecy Act and anti-money laundering statutes. So what about her deposits or withdrawals triggered the bank's concern? So that's a good question, Your Honor. So it was high-velocity transactions in high-risk jurisdictions. So there was a lot of money, a lot of transactions quickly coming in and out of the account. They were not for significant sums of money. We've never said that they were for significant sums of money. But there was a lot of activity occurring. Money was being deposited in the U.S. and being withdrawn in countries abroad. And very frequent use of ATM machines abroad without any concern for the cost of those ATMs, which all raised suspicion for the bank. And this is all done through an automated mechanism that banks are required to maintain to comply with the Bank Secrecy Act. So was the computer that triggered the look at this? Correct, Your Honor. Not a human being? The computer initiates some sort of alert when there's suspicious activity on an account. And there were a number of transactions that indicated- Who asked? No human input. Well, a human then investigates the alerts. So the alert is automatic. The human being then goes and would not otherwise have investigated. Correct, Your Honor. There's a software system, I think that's called SAS, that PUB uses that generates the alerts. They're assigned then to a financial intelligence unit investigator who's assigned to look into the alerts and see if they can come up with some explanation for the transactions. If they're unable to come up with an explanation, the transactions and the alerts are then sent to a SAR analyst, which happened in this case, and there's a document on May 20, 2016. And what happens when it goes to SAR? Who looks at it there? A person, a SAR analyst, somebody who's trained in- A SAR analyst at your bank or the Fed's? No, PUB. And PUB has a SAR analyst? Every bank has SAR analysts. Okay, yeah. And this person looks at the triggers that have all the information leading up to this? Does this person know that a chain of events was started by your error in creating the account? No, Your Honor. Totally separate. The SAR analyst would not have any information about the overdraft because they were looking at the personal accounts, the activity in the personal accounts. Remember, Your Honor, there was no activity in the movement account, so there was no trigger on the movement account. Don't you think that would have been useful for the SAR analyst to know that this whole chain of events was started by your error by charging service charges on this account? But, Your Honor, the investigation of the personal accounts that Ms. Guillet had with the bank were not triggered by the overdraft. The investigation started before the overdraft. Before you knew about the overdraft? Correct. Okay, well, we'll see. I mean, when did the investigation start, did you say? So, a SAR analyst, we don't have a specific date when the investigation began, but there's an email from the SAR analyst to the branch manager at the bank where Ms. Guillet banked, and that's May 20th, 2016. Do you need the appendix citation? No. Okay. No, I have your brief, and I don't need it. An email from the SAR analyst, and remember, it's assigned to a SAR analyst after it's already been investigated by a financial intelligence unit analyst, so it gets kicked up to somebody. A financial intelligence analyst also works at the bank? Somebody who also works at the bank. And the SAR analyst on May 20th, 2016, again, six days before even the first letter was sent to Ms. Guillet, emailed the branch manager saying, I'm looking into the transactions, can you reach out to the customer to get some explanations for these transactions? And you couldn't reach the customer because she was abroad? Correct. And they tried calling her at the phone number she provided, and the phone wasn't accepting calls. So you proceeded, what's the next step? So the SAR analyst, as you may suspect, this happens fairly frequently that the customer cannot be reached to provide an explanation, and the policy and procedures at the bank is that the SAR analyst is required to complete his or her investigation to the best of their capability without speaking with the customer. And if they're able to clear the transaction, they clear the transaction. If they can't clear the transaction, then they may have to take the next step, which would be filing a SAR report. Again, something obligated that banks are required to do under federal law. I have no further questions. Thank you, counsel. Thank you. We'll hear a rebuttal. I wanted to correct a few things. Ms. Winhold completely distorts the facts in this case. On May 17th, three days prior to this e-mail that she refers to, the movement account, the nonprofit account, went into overdraft. During depositions, they testified that the nonprofit account's overdraft is what triggered the investigation into the personal account. Do you have a citation for that? I will work on that right now, Your Honor. So they changed their story. Yes, Your Honor. You're alleging that they changed their story. Yes, Your Honor. Also, they testified that the review, the investigation into the personal account in the spring of 2016 during this time window led to no adverse action. They did not decide to close the account during that time. And they decided to close the account completely consistent with that letter. And just specifically reading directly from PUB's answer to the New York Division of Human Rights, it says, Ms. Gay's accounts with the bank were closed because her account was overdrawn and she failed to respond and address the overdraft status despite repeated letters advising her of the overdraft. Is there evidence, you'll have to remind me, is there direct evidence of any kind of evidence that was affirmative evidence that this had to do with the racial or otherwise ethnic qualities? They testified during the depositions that when a SAR analyst gets one of these alerts, they do multiple things to investigate a person, including a Google search. So they would have Google searched the Movement Foundation. They would have seen that it was a Muslim nonprofit account that was doing work in Senegal. And they would have seen that it was related to Ms. Gay. As Your Honor noted, they did not So they likely knew about it. That is correct, Your Honor. They likely knew about it. The only reason is that they wouldn't have done it had she been white. That's for a jury to decide about inferences, Your Honor. It's not up to me. I'm just wondering about the evidence. The evidence shows that the closure of the accounts was incontrovertibly directly linked to the personal account closures were directly linked to the nonprofit account closure. The letters specifically state that. Someone admitted that during the deposition? Yes, Your Honor. Ms. Wilber, who is the senior vice president of the bank, directly testified that we would not want to We see that she has other accounts and we do not want to do business with someone who owes us money. The high velocity transactions, Ms. Wittenholt said there was a lot of money. She had an average of $2,000. She said there were a lot of transactions. Well, initially she said there was a lot of money and then she later corrected that there were transactions. But, Your Honor, there was an average by their own account. There was an average of $2,000 in her bank accounts, her personal accounts, during the entirety of her banking relationship. The custodial accounts had even less money. Her personal accounts had $2,000. So what they're doing is they're peppering in the buzzwords that are required. And this FIU report is post dated. It was produced after the New York Division of Human Rights had already released their findings. This was a solution in search of a problem, Your Honor. Do you have a citation to the deposition that you can give me where they said it was directly related? Yes, Your Honor, I can. Actually, one second. This is Ms. Wilbur testifying on page, sorry, I just have it right here. Ms. Wilbur testifying on page 890 of the appendix. And I'll read it. Because although there were different entities, she was still the owner on all the accounts. And the bank has knowledge that those accounts were hers. And we would not want to do business with someone who owes us money. It can't be more clear than that, Your Honor. But it doesn't say because of her protected characteristics. It just said because she owes money. The changing stories can be signs of pretext. The case law is clear that suspicious timing with other pretexts can be sufficient to survive summary judgment. And it's up to a jury to draw inferences that discriminatory intent can be reached through inferences from circumstantial evidence, Your Honors. Thank you very much. We sort of know that. Sorry. No, you answered the question. I'm so sorry. Thank you both. Thank you so much. We'll take the case under advisement. Thank you.